UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RICHARD MEZA,

Plaintiff,

v.

AIROLDI, et al.,

Defendants.

Case No. 24-cv-07269-JST

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: ECF No. 16

Plaintiff, an inmate currently housed at Kern State Prison, has filed a *pro se* action pursuant to 42 U.S.C. § 1983 regarding his conditions of confinement at Sonoma County Main Adult Detention Facility where he was previously housed as a pretrial detainee. Now pending before the Court is Defendants' motion for summary judgment. ECF No. 16. Plaintiff has not filed an opposition, and the deadline to do has since passed. Defendants have not filed a reply. For the reasons set forth below, the Court GRANTS Defendants' motion for summary judgment. ECF No. 16.

## DISCUSSION

### I.    Procedural Background

In his complaint, Plaintiff sued the following Sonoma County Sheriff's Office officials: Sheriff Eddie Engram, sergeants Airoldi and Jimenez, DGOs Gordon and Gonce, and lieutenants Lee, Cleek, and Patrick. The complaint made the following allegations. Between February 10, 2024 and October 4, 2024, Defendants knowingly allowed Plaintiff, at that time a pretrial detainee, to be housed in housing units that did not provide him with the state-required ten hours of weekly out-of-cell time. Defendants Gordon and Patrick blamed the limited out-of-cell time on facility issues and a false state of emergency. Defendants Lee and Jimenez stated that Plaintiff's behavior

issue justified the deprivation of out-of-cell time.  Defendants Arioli, Jimenez, and Cleek claimed that a transfer to C-Module would allow for more out of cell time, but defendant Gonce has admitted that "C-Module is in fact worse than Male-Special/Ad-Seg."  The prolonged isolation has inflicted mental health damage on Plaintiff.  Defendant Engram is part of the problem because he is in charge of the other defendants.  The complaint requests the following relief: "Injunctive relief from illegal conditions.  Punitive and compensatory damages for irreparable harm of $2,000,000."  ECF No. 1.

The Court found that, liberally construed, the complaint's allegation that defendants Jimenez, Airoldi, Gordon, Gonce, Cleek, Patrick, and Lee were aware that Plaintiff's housing placement did not allow for sufficient out of cell time yet did nothing to address the situation stated a cognizable Fourteenth Amendment claim.  The Court dismissed defendant Engram from the action because there is no supervisory liability under Section 1983, but granted Plaintiff leave to amend his claim against defendant Engram.  The Court dismissed with prejudice Plaintiff's claim for damages as no physical injury was alleged and the Prison Litigation Reform Act prohibits damages for emotional or mental injuries in the absence of a physical injury.  *See generally* ECF No. 10.

Plaintiff did not file an amended complaint.  ECF No. 1 remains the operative complaint.

## II.   Factual Background

The following facts are undisputed unless otherwise noted.

From June 28, 2023, to August 13, 2025, Plaintiff was in the custody of Sonoma County Sheriff's Office and housed at Sonoma County Main Adult Detention Facility ("MADF").  Per his request, Plaintiff was booked into MADF on June 28, 2023, as a special Protective Custody ("PC") inmate.  ECF No. 16-2 at 10.  On August 13, 2025, Plaintiff was released into the custody of the California Department of Corrections and Rehabilitation. Plaintiff is currently housed at North Kern State Prison.  ECF No. 16-2 at 2, 8, 10.

### A.   MADF Policies Governing Out-of-Cell Activity ("OCA") Time

*Assigning Classification Levels to Incarcerated Persons.*  MADF's inmate classification system assigns incarcerated persons a classification level that determines their housing placement,

United States District Court
Northern District of California

United States District Court
Northern District of California

and their work, programming, and leisure activities.  The classification level is determined on a case-by-case basis, and takes into account (1) safety and security risks and management problems for the incarcerated person, other persons, and detention staff, and (2) the incarcerated person's sex, age, criminal sophistication, seriousness of crime charged, physical or mental health needs, assaultive/non-assaultive behavior, gang affiliations, and stay away orders.  ECF No. 16-2 at 2-3.  An incarcerated person may appeal his or her classification level once every thirty days.  ECF No. 16-2 at 3.  An incarcerated person may reduce his classification level by engaging in positive behavior, following facility rules, and complying with correctional staff orders.  ECF No. 16-2 at 3.  Classification deputies review all incarcerated persons' classification status every fourteen days or thirty days, depending on the classification level.  ECF No. 16-2 at 3.  Incarcerated persons are assigned to housing modules based on their classification level.  The housing module's structure, privilege level, supervision level, programming options, and OCA availability depend on the classification/custody level of the incarcerated persons housed there.  ECF No. 16-2 at 3.

*MADF OCA Policy*.  The policy of Sonoma County Sheriff's Office is to offer all incarcerated persons a minimum of ten hours of OCA time per seven-day period, to the extent possible.  The availability of OCA time available to an incarcerated person can vary on a weekly and daily basis depending on a variety of factors.  The relevant factors include the incarcerated person's classification status, the housing module configurations, programming, COVID and quarantine protocols based on health mandates, facility lockdowns, and other operational needs.  The following are examples of how the factors listed above affect OCA time.  For safety reasons, incarcerated persons generally receive the same OCA time as others within their same classification level and housing module.  Some incarcerated persons cannot mix with others and require separate OCA time.  Facility lockdowns are necessary for conducting population counts, for responding to incidents and other emergencies, to provide a secure environment for staff shift changes, and to provide a safe environment for facilities trainings.  ECF No. 16-2 at 4.  OCA time is not mandatory and incarcerated persons may refuse their OCA time.  Deputies in the housing modules document all OCA time on a daily basis for each incarcerated person, including all refusals.  ECF No. 16-2 at 4-5.

**B.    Plaintiff's OCA Time from February 10, 2024 to October 4, 2024**

*Plaintiff's Classification Level and Housing Placement*.  After Plaintiff assaulted another inmate, his classification level was elevated on February 9, 2024 from a max charge ("MC"), protective custody ("PC") inmate to add behavior problem ("BP") and administrative separation ("SG") designations.  ECF No. 16-2 at 3.  During the relevant time period, Plaintiff received incident reports for the following rule violations: refusing to cooperate with classification (April 2024), being disruptive, defiant, and threatening towards staff (May 25 and July 24, 2024), gang writings (September 19, 2024), and possession of contraband (October 2, 2024).  ECF No. 16-2 at 3-4.  Because of these incident reports, Plaintiff's classification level remained MX PC BP and/or SG levels during the relevant time period and he was housed in either the Male Special Housing Unit ("MLSP") or C-Module.[1]  ECF No. 16-2 at 3-4, 12.  MLSP and C-Module offer less OCA time than other housing modules.  Between February 10, 2024 to October 4, 2024, Plaintiff was housed in MLSP for 21 weeks; in C-Module for 8 weeks; and in a combination of MLSP, C Module, and the Mental Health Module for the other weeks.  ECF No. 16-2 at 12.

*Reductions in OCA Time.*  Plaintiff's OCA time was reduced during the relevant time period due to the following.

During the May 21-27, 2024 period, Plaintiff was placed on a medical no mix status due to a positive COVID test which resulted in missing one round of OCA.  ECF No. 16-2 at 5.

On six occasions, Plaintiff lost OCA time due to rule violations.  On April, 27, 2024, Plaintiff lost OCA time because he was found in possession of saved food and ripped clothing.  On July 13, 2024, Plaintiff lost OCA time because he was slow to lockdown after he was told OCA time was over and he stayed in the shower long after time was up.  On August 4, 2024, Plaintiff lost OCA time because he was found in possession of an orange spoon.  On August 18, 2024, Plaintiff lost OCA time because he was passing and receiving notes under his door.  On August 27, 2024, Plaintiff lost OCA time because he called FTO Canfield a "fat bitch."  On September 13, 2024, Plaintiff lost OCA time because his cell vent was covered with a piece of

---

[1] Jail records indicate that Plaintiff was housing in the mental health module for some portion of the May 19, 2024 to June 1, 2024 time period.  ECF No. 16-2 at 12.

United States District Court
Northern District of California

newspaper. ECF No. 16-2 at 28-33.

On three occasions, Plaintiff lost OCA time due to being placed on disciplinary separation status, which limits the incarcerated person to 30 minutes of OCA daily. From June 19 to 29, 2024, Plaintiff was placed on disciplinary separation for assaulting another incarcerated person inside a cell on February 9, 2024. During this time period, Plaintiff received approximately 7 hours of OCA time. From August 14 to 17, 2024, Plaintiff was placed on disciplinary separation for being disruptive during SERT callout and being defiant towards staff on May 25, 2024. During this time period, Plaintiff received approximately 7.5 hours of OCA time. From August 21 to 24, 2024, Plaintiff was placed on disciplinary separation for making threats to a detention assistant on July 24, 2024. During this time period, Plaintiff received approximately 9.5 hours of OCA time. ECF No. 16-2 at 18-26.

*Overall OCA Time Offered and Taken*. Between February 10, 2024 to October 4, 2024, an average of 9.9 OCA hours per week was made available to Plaintiff. Plaintiff refused OCA on 68 days, for a total of 58.25 hours refused. Due to Plaintiff's refusing OCA time, disciplinary separations, rule violations, and one instance of medical no-mix status, Plaintiff took an average of 8.2 OCA hours per week. ECF No. 16-2 at 12-16. Plaintiff's OCA time taken ranged from a low of 3.65 hours during the week of April 28, 2024 to a high of 16.15 hours during the week of September 1, 2024. ECF No. 16-2 at 12-13.

*OCA Time Offered and Taken in MSLP*. During the 21 weeks when Plaintiff was housed solely in MLSP, an average of 11.1 OCA hours per week was made available to Plaintiff, and he took an average of 8.9 OCA hours per week due to his refusing OCA time, rules violations, and disciplinary separations. ECF No. 16-2 at 12, 15-33. Plaintiff's OCA time taken ranged from a low of 5.32 hours during the week of February 11, 2024 to a high of 16.15 hours during the week of September 1, 2024. ECF No. 16-2 at 12.

*OCA Time Offered and Taken in C-Module*. During the eight weeks when Plaintiff was housed solely in C-Module, an average of 6.97 OCA hours per week was made available to Plaintiff, and he took an average of 6.22 OCA hours per week due to his refusing OCA time and rule violations. ECF No. 16-2 at 12, 15-16, 28-33. Plaintiff's OCA time taken ranged from a low

of 3.65 hours during the week of April 28, 2024 to a high of 9.42 hours during the week of September 29, 2024.  ECF No. 16-2 at 12.

*OCA Time Offered and Taken in Mixed Housing*.  Plaintiff spent six weeks housed in a combination of MLSP, C Module, and the Mental Health Module.  ECF No. 16-2 at 12.  During these six weeks, an average of 8.4 OCA hours per week was made available to Plaintiff, and he took an average of 9.2 OCA hours per week due to his refusing OCA time and rule violations.  ECF No. 16-2 at 12, 15-16,  28-33.  Plaintiff's OCA time taken ranged from a low of 6.11 hours during the week of May 26, 2024 to a high of 10.56 hours during the week of September 8, 2024.  ECF No. 16-2 at 12.

*OCA Time after October 4, 2024*.  In October and November of 2024, Plaintiff's behavior improved, which resulted in him being transferred to J-Module and FG Module.  J-Module and FG Module provide OCA time well in excess of 10 hours per week.  ECF No. 16-2 at 6.  While housed in J-Module and FG Module, Plaintiff took an average of 13.1 hours of OCA time per week.  ECF No. 16-2 at 13.  The record is silent as to whether Plaintiff refused any OCA time while in J-Module and FG Module.

## III.    Defendants' Summary Judgment Motion

Defendants seek summary judgment on the following three grounds.  First, Defendants argue that because Plaintiff is no longer in their custody and Defendants cannot provide the injunctive relief sought, Plaintiff lacks standing to bring this action and the matter is moot.  Second, Defendants argue that it is undisputed that the amount of OCA time provided to Plaintiff did not violate the Fourteenth Amendment as the amount of OCA time provided was not punitive, was not provided in bad faith, and was not provided with a reckless disregard for Plaintiff's health and safety.  Third, Defendants argue that they are entitled to qualified immunity.  *See generally* ECF No. 16.  Plaintiff has not filed an opposition to Defendants' summary judgment motion and the deadline to do so has long passed.  Defendants have not filed a reply.

### A.    Summary Judgment Standard

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

United States District Court
Northern District of California

law." *See* Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See id.*

A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial [,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  *Id.* at 323.  The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file, 'designate 'specific facts showing that there is a genuine issue for trial.'" *See id.* at 324 (citing Fed. R. Civ. P. 56(e)).  "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact" precluding summary judgment.  *See Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

For purposes of summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all justifiable inferences in that party's favor.  *AXIS Reinsurance Co. v. Northrop Grumman Corp.*, 975 F.3d 840, 844 (9th Cir. 2020).  If, as to any given material fact, evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the Court must assume the truth of the evidence set forth by the nonmoving party with respect to that material fact.  *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013).  However, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence.  *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017).

United States District Court
Northern District of California

### B.    Standing

#### 1.    Legal Standard

Article III standing is present only when (1) a plaintiff suffers a concrete, particularized injury which is actual or imminent; (2) there is a causal connection between the injury and the conduct complained of; and (3) the injury will likely be redressed by a favorable judicial decision. *See Carney v. Adams*, 592 U.S. 53, 58 (2020). "Standing for prospective injunctive relief requires either 'continuing present adverse effects' or "a sufficient likelihood" to be 'again wronged in a similar way.'" *Villa v. Maricopa County*, 865 F.3d 1224, 1229 (9th Cir. 2017) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496-98 (1974), and *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). Where the plaintiff seeks injunctive relief, standing requires a "real and immediate threat" of future injury. *See Lyons*, 461 U.S. at 105.

Standing is evaluated by the facts that existed when the complaint was filed, but mootness inquiries require courts to look to changing circumstances that arise after the complaint is filed. *ACLU v. Heller*, 471 F.3d 1010, 1016 (9th Cir. 2006). A claim is considered moot if it has lost its character as a present, live controversy, and if no effective relief can be granted due to subsequent developments. *See Flast v. Cohen*, 392 U.S. 83, 95 (1968). Where injunctive relief is involved, questions of mootness are determined in light of the present circumstances. *See Mitchell v. Dupnik*, 75 F.3d 517, 528 (9th Cir. 1996). "While a prisoner's transfer will naturally moot claims for prospective relief" as to conditions at a former particular facility, "a prison transfer does not defeat jurisdiction where a prisoner's injury stems from a system-wide policy." *Tiedemann v. Von Blanckensee*, 72 F.4th 1001, 1008 (9th Cir. 2023) (because Regional Director responsible for every BOP facility in which plaintiff was housed could grant him relief requested, suit not rendered moot by federal prisoner's transfer to a different prison). When an inmate is released from prison or transferred to another prison and there is no reasonable expectation nor demonstrated probability that he will again be subjected to the prison conditions from which he seeks injunctive relief, the claims for injunctive are moot. *See Dilley v. Gunn*, 64 F.3d 1365, 1368-69 (9th Cir. 1995).

8

United States District Court
Northern District of California

### 2.     Analysis

Defendants argue that Plaintiff's transfer out of their custody on August 13, 2025 to the custody of the CDCR to serve a 22-year state prison sentence moots his Fourteenth Amendment claim because the only remaining relief sought in this action – "injunctive relief from illegal conditions" – is moot as Plaintiff's lengthy state sentence makes it unlikely that he will be in the custody of Sonoma County again.  ECF No. 16 at 16.  The Court agrees.  The remaining request for relief is "injunctive relief from illegal conditions."  ECF No. 1 at 3.  "Illegal conditions" presumably refers to MADF's failure to provide Plaintiff with at least 10 hours of out-of-cell time per week.  Plaintiff's transfer to CDCR custody to serve a 22-year sentence has mooted Plaintiff's request for injunctive relief as Plaintiff has not demonstrated, and the record does not support, any reasonable probability that Plaintiff will again be in the custody of the Sonoma County Sheriff's Office and housed at MADF.  The Court therefore GRANTS Defendants' request for summary judgment on the grounds that this case is now moot.  Additionally, regardless of whether this case is moot, as discussed in further detail below, Defendants are also entitled to summary judgment on the merits of Plaintiff's Fourteenth Amendment claim.

### C.     Fourteenth Amendment Out of Cell Time Claim

#### 1.     Legal Standard

When a pretrial detainee challenges conditions of his confinement, the proper inquiry is whether the conditions amount to punishment in violation of the Due Process Clause of the Fourteenth Amendment.  *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979).  "To constitute punishment, a government action must (i) harm a detainee and (ii) be intended to punish him." *Houston v. Maricopa County*, 116 F.4th 935, 940 (9th Cir. 2024).  If a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective it does not, without more, amount to punishment.  *See Bell*, 441 U.S. at 539.  Because states must be able to take steps to maintain security and order at pretrial facilities, restrictions and conditions that are reasonably related to a facility's interest in maintaining jail security and order are not, without more, unconstitutional punishment.  *See Bell*, 441 U.S. at 540.

To determine whether a particular condition or restriction of pretrial detention amounts to

punishment in the constitutional sense of the word, the court first looks to whether the disability imposed is for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. *See Bell*, 441 U.S. at 538. Absent a showing of an express intent to punish, whether a condition or restriction amounts to punishment generally will turn on whether there is an alternative, rational purpose for the condition/restriction, and whether the condition/restriction appears excessive in relation to that alternative purpose. *See Bell*, 441 U.S. at 538. In addition, in addressing a Section 1983 claim brought by a pretrial detainee, "courts must defer to the judgment of correction officials unless the record contains substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security." *Florence v. Board of Chosen Freeholders of the County of Burlington, et al.*, 566 U.S. 318, 322-23 (2012); *see, e.g., Oliver v. Baca*, 913 F.3d 852, 857-60 (9th Cir. 2019) (finding that exigent circumstances of inmate disturbances and lockdowns justified denying pretrial detainee a bed for his three-and-a-half-day stay at county reception center because there was no basis in the record on which to conclude that sheriff department's response to the inmate disturbances constituted an unnecessary or unjustified response to problems of jail security).

The Court's analysis of Plaintiff's Fourteenth Amendment claim is guided by the caselaw requiring prisons to provide inmates with exercise opportunities. The Constitution requires jail officials to provide outdoor recreation opportunities, or otherwise meaningful recreation, to prison inmates. *Shorter v. Baca*, 895 F.3d 1176, 1185 (9th Cir. 2018). The Ninth Circuit has not specified the "minimum amount of weekly exercise that must be afforded to detainees who spend the bulk of their time inside their cells." *Pierce v. County of Orange*, 526 F.3d 1190, 1212 (9th. Cir. 2008). Determining whether prison officials are providing constitutionally adequate outdoor exercise time requires an evaluation of the totality of the circumstances, including other opportunities for indoor recreation, the length of time the inmate is held under the conditions, whether the inmate has contact with others, whether disciplinary measures impact the conditions, and whether the inmate has opportunities for training or rehabilitation programs. *Norbert v. City & County of San Francisco*, 10 F.4th 918, 929-33 (9th Cir. 2021) (finding that district court reasonably concluded that plaintiffs' conditions did not resemble extreme circumstances which

required outdoor exercise because plaintiffs were given "constitutionally sufficient recreation time"; most inmates could spend eight hours per day out of their cells between free time and programming, could exercise seven days a week for at least thirty minutes for administrative segregation inmates and up to eight hours for general population inmates in both day rooms and gyms, which allowed both outside light and ambient air).  Courts have found the following circumstances are constitutionally inadequate: ninety minutes per week of exercise, *Pierce*, 526 F.3d at 1212; forty-five minutes per week of outdoor exercise over a six-week period, *Allen v. Sakai*, 48 F.3d 1082, 1087-88 (9th Cir. 1994); six-and-one-half week denial of outdoor exercise, *Lopez v. Smith*, 203 F.3d 1122, 1132-33 (9th Cir. 2000), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014); six-month denial of outdoor exercise, *Keenan v. Hall*, 83 F.3d 1083, 1089-90 (9th Cir. 1996); thirteen-month-and-twenty-five day deprivation of outdoor exercise, *Thomas v. Ponder*, 611 F.3d 1144, 1151 (9th Cir. 2010).

The denial of outdoor exercise for security reasons generally will not violate the Eighth Amendment.  *See LeMaire*, 12 F.3d at 1458 (upholding long-term denial of outdoor exercise to prisoner representing "grave security risk" who can exercise within his cell); *Hayward v. Procunier*, 629 F.2d 599, 603 (9th Cir. 1980) (upholding temporary deprivation of outdoor exercise during "lockdown" initiated during a "genuine emergency"); *Toussaint v. McCarthy*, 597 F. Supp. at 1412 (upholding denial for security reasons).  However, neither disciplinary infractions without determination of security risk nor logistical problems which make it difficult to provide adequate outside exercise justify denial of outdoor exercise.  *Allen*, 48 F.3d at 1087-88.  In addition, a prisoner must not be forced to choose between his clearly established constitutional right to outdoor exercise and other constitutionally protected rights.  *See Hebbe v. Plier*, 627 F.3d 338, 343-44  (9th Cir. 2010) (reversing dismissal because plaintiff sufficiently alleged that defendants violated Eighth Amendment by forcing him to choose between right to exercise and constitutional right of access to courts to research nonfrivolous legal claim); *Allen v. City & County of Honolulu*, 39 F.3d 936, 940 (9th Cir. 1994) (prisoner should not have to forego outdoor recreation to which he would otherwise be entitled simply because he exercises his clearly established constitutional right of access to courts).

11

### 2.    Analysis

Defendants argue that the amount of OCA time provided to Plaintiff complied with the Fourteenth Amendment because the amount of time was rationally related to the legitimate nonpunitive governmental interest of preserving internal order and discipline; was not punishment; was not done in bad faith or with reckless disregard for Plaintiff's health and safety; and did not violate a constitutionally protected liberty interest.  Defendants further argue that 15 Cal. Code Regs. § 1065's requirement of 10 hours per week of out-of-cell time is not a constitutional requirement, but a procedural regulation to guide the development of policies and procedures which must be applied alongside Cal. Penal Code § 2600 which provides that an incarcerated person may be deprived of rights as necessary to provide for the reasonable security of the institution.  *See generally* ECF No. 16 at 19-22.

Viewing the record in the light most favorable to Plaintiff, the Court finds that, considering the totality of the circumstances, the amount of OCA time provided to, and taken by, Plaintiff from February 10, 2024 to October 4, 2024 did not violate the Fourteenth Amendment.  Although 15 Cal. Code Regs. § 1065 requires 10 hours per week of out-of-cell time, this requirement is not constitutional.  No court has specified a minimum out-of-cell time necessary to satisfy the federal Constitution, *Pierce*, 526 F.3d at 1212, and violations of state law do not state a federal constitutional violation, *see Ybarra v. Bastian*, 647 F.2d 891, 892 (9th Cir. 1981) ("Only federal rights, privileges, or immunities are protected by the [S]ection [1983]. Violations of state law alone are insufficient.").  The following factors support the Court's finding that the OCA time provided to and taken by Plaintiff was constitutionally sufficient.

First, Plaintiff's reduction in OCA time due to his behavior issues was reasonably related to the legitimate governmental objective of insuring institutional safety.

Second, the reduction in OCA time in MLSP and C-Module was not excessive in relation to the governmental objective of institutional safety.  The average OCA time available to Plaintiff while housed in MLSP and C-Module – 9.9 hours – was only 25% less than the average OCA time taken by Plaintiff while housed in other housing modules – 13.1 hours.  In addition, it appears that, under the right conditions, it was possible to take the same amount of OCA time in MLSP and C-

Module as in other housing modules as, on three occasions in MLSP and C-Module, Plaintiff's OCA time was higher than his average while housed in other modules: 13.45 hours the week of August 25, 2024, 16.15 hours the week of September 1, 2024; and 14.65 hours the week of November 3, 2024.

Third, the loss of OCA time due to rule violations or disciplinary separation also was not excessive in relation to the governmental objective of institutional safety. During the weeks that Plaintiff lost OCA time due to disciplinary issues, his OCA time taken did not fall below 8.9 hours per week.

Fourth, Plaintiff was not regularly subjected to low amounts of OCA time. The 3.65 hours taken during the week of April 28, 2024 appears to be an anomaly.

Fifth, Plaintiff himself reduced the OCA time taken by refusing a total of 58.25 hours of OCA time, over 68 days.

Finally, the OCA time provided to and taken by Plaintiff exceeds the out-of-cell exercise time which courts have previously found constitutionally insufficient, such as the ninety minutes per week of exercise that the Ninth Circuit found constitutionally inadequate in *Pierce*. During the relevant time period, the least amount of out-of-cell time that Plaintiff received was 3.65 hours during the week of April 28, 2024, and Plaintiff was offered, on average, 9.9 hours per week.

In sum, the amount of OCA time provided and taken by Plaintiff was constitutionally adequate because the reduction in Plaintiff's OCA time was the direct result of Plaintiff's misconduct and Plaintiff's refusal, for the legitimate nonpunitive governmental objective of ensuring institutional safety, was not excessive in relation to this objective, and was far above the threshold that prior courts have found constitutionally insufficient. *See, e.g., LeMaire*, 12 F.3d at 1458 (finding that LeMaire's loss of outside exercise privileges did not violate Eighth Amendment because loss was "directly linked to [LeMaire's] own misconduct, which raises serious and legitimate security concerns within the prison").

Qualified immunity is an entitlement, provided to government officials in the exercise of their duties, not to stand trial or face the other burdens of litigation. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). To determine whether an officer is entitled to qualified immunity, the Court must

United States District Court
Northern District of California

consider whether (1) the officer's conduct violated a constitutional right, and (2) that right was clearly established at the time of the incident. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts are not required to address the two qualified immunity issues in any particular order, and instead may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. Because there was no violation of Plaintiff's constitutional rights, as explained above, there is no necessity for further inquiry concerning qualified immunity. *See County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all.").

Defendants have demonstrated that there is no genuine issue of material fact as to whether the OCA time made available to, and taken by, Plaintiff violated the Fourteenth Amendment. The Court therefore GRANTS summary judgment in favor of Defendants on the merits of the Fourteenth Amendment claim.

**CONCLUSION**

For the reasons set forth above, the Court GRANTS Defendants' summary judgment motion. ECF No. 16. Judgment is entered in favor of Defendants and against Plaintiff. The Clerk shall terminate any pending motions as moot, and close the case.

This order terminates ECF No. 16.

**IT IS SO ORDERED.**

Dated: June 18, 2026

_____
JON S. TIGAR
United States District Judge

14